NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0151n.06
Filed: February 24, 2005

No. 03-2036

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

THE ESTATE OF TERRY SOWARDS,

    Plaintiff-Appellant,

v.

CITY OF TRENTON; CHIEF OF
POLICE, LT. MESCHKE; PATROL
OFFICER SCHEFFLER; PATROL
OFFICER CHEPLICK; PATROL
OFFICER TANGUAY; CORPORAL
O'CONNOR; JOHN DOE, individually
and as agents of the City of Trenton and
Trenton Police Department, all Jointly and
Severally,

    Defendants-Appellees.

                  /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

Before: MARTIN and BATCHELDER, Circuit Judges; JORDAN, Senior District Judge.[*]

    LEON JORDAN, Senior District Judge. This action arises from the death of Terry Sowards ("Sowards"), whose estate appeals the district court's award of partial summary judgment in favor of defendants and the court's subsequent order limiting the scope of damages available on the remaining claims. For the reasons that follow, we **AFFIRM** the

---

    [*]The Honorable R. Leon Jordan, Senior United States District Judge for the Eastern District of Tennessee, sitting by designation.

district court.

I.

On the evening of July 17, 2001, Sowards became involved in an altercation with a man named Alan Aday ("Aday"), a resident in Sowards's apartment complex whose wife held a custodial management position. Sowards attempted to poke Aday in the eye and to throw beer at him, and Aday responded by striking Sowards in the face. According to witnesses, Sowards then pulled a knife and threatened Aday with it. However, Aday was able to disarm Sowards without being injured. The Adays' daughter, who had been watching the altercation, called the Trenton Police at approximately 8:17 p.m.

Trenton Police Officer Todd Scheffler responded to the call and arrived on the scene shortly thereafter. Officer Scheffler questioned Aday about the incident, and Aday identified Sowards as the assailant and the man who was walking across the parking lot in the direction of the apartment building (Building 3316). Officer Scheffler got in his patrol car and followed Sowards, losing sight of him as Sowards walked around a corner. When Officer Scheffler turned the corner, he saw the door to Building 3316 closing. He entered through the door that led to a common hallway. Officer Scheffler heard a door close on the second floor and also heard a person playing with a lock. He proceeded to the second floor and to the apartment where he had heard the locking noise, which turned out to be Sowards's apartment number 234.

Officer Scheffler knocked, but Sowards refused to open the door. He began yelling profanities and told Officer Scheffler to go away. Sowards also said, "I have a message for your superiors and I've got a surprise for you." Corporal Dennis O'Connor and Officers William Cheplick and Rick Tanguay arrived on the scene at about 8:20 p.m. Corporal O'Connor attempted to have Sowards come out of the apartment, but Sowards responded by yelling profanities and referring to a "surprise" that he had for the officers. Sowards then passed a note into the hallway through the door jamb. The note was irrational and non-responsive to the officers' requests.[1] When these events were unfolding, the officers involved did not know that Sowards had for a number of years been diagnosed as a paranoid schizophrenic and had in the past been hospitalized both voluntarily and involuntarily for this illness.

Corporal O'Connor determined that the officers should use force to enter the apartment and arrest Sowards. At this point, no effort had been made to identify the occupant of the apartment, to ascertain whether any warrants were outstanding for the occupant, or to determine if the occupant had a prior police record. In addition, it is undisputed that Sowards no longer had the knife with which he had threatened Alan Aday, and the officers had no reason to believe Sowards was armed. Although the officers had not

---

[1] In part, the note stated, "When we misuse our free-will and LIVE backwards, spells EVIL, LIVED backwards, spells DEVIL. People can create their own devil." and "We are now, as the dinosaurs were, the biggest - killing species. Your bad Kharma dives down, as far as, our good kharma rises, were right back to ground-zero, with other species of life."

obtained a warrant to enter the apartment, Corporal O'Connor and Officer Scheffler kicked the door twice, which resulted in the door being opened approximately one foot. All four officers saw a chrome hand gun being pointed at them through the doorway opening. Officer Tanguay shouted "gun," dove for cover and called for assistance and an ambulance. At the same time, Officer Scheffler moved to the right toward the laundry room and began firing at the gun protruding from the door. Corporal O'Connor returned a round of fire before taking cover in an interior stairway. Seconds after the initial gunfire, Sowards again pointed the gun at the officers who returned a "volume" of shots.[2] Corporal O'Connor and Officer Tanguay saw Sowards fall away from the doorway.

Officer Tanguay radioed that shots were fired, and one of the officers said, "He's hit, he's down." Fearing that Sowards might still pose a threat, the officers did not attempt to enter the apartment. Lieutenant Mark Meschke arrived at about 8:30 p.m. and requested a SWAT team.[3] An ambulance also arrived on the scene at approximately 8:30 p.m. The ambulance attendants did not reach Sowards until a SWAT team was assembled and the building was evacuated and secured. At 2:45 a.m. a SWAT team entered Sowards's apartment, and shortly thereafter, an EMT technician entered the apartment and reported

---

[2] The investigative report prepared by the Michigan State Police indicated that the officers fired thirty nine shots.

[3] Defendant Meschke became Chief of the Trenton Police Department in November, 2001.

Sowards was dead.[4]  A  .25 caliber Raven Arms MP -25 handgun was found in the seat of a recliner that was near Sowards's body.  There was no blood on the handgun, and the latent fingerprints on the gun could not be identified.  Two empty .25 automatic shell cartridges that had been fired from the Raven Arms handgun were located, one in the apartment and one just outside the apartment door in the hallway.  The bullets from these two shells were not recovered. The detective sergeant who conducted the investigation for the Michigan State Police did not reach a conclusion as to whether Sowards fired the handgun.  A sister and girlfriend reported that Sowards hated guns and did not own one.  Another sister along with a nephew and a friend indicated that Sowards had purchased a gun within a month of his death.

II.

The Estate of Terry Sowards filed suit alleging various claims against the officers involved in the shooting and the City of Trenton (the "City") pursuant to 42 U.S.C. § 1983 and Michigan law. The § 1983 claims against Officers Scheffler, Cheplick and Tanguay and Corporal O'Connor alleged that they violated the Fourth and Fourteenth Amendments by the use of excessive force resulting in the death of Sowards, and that the warrantless entry into Sowards's apartment violated the Fourth Amendment.  These officers and defendant

---

[4] A later autopsy revealed that Sowards died of multiple (seven) gunshot wounds.

Meschke were alleged to have violated the Fourteenth Amendment's guarantee of substantive

due process by arbitrarily creating or escalating the fatal confrontation with Sowards. The

claim against the City asserted that Sowards's death was caused by Corporal O'Connor's

violation of the City's policy on "Barricaded Gunman and/or Hostage Situations," as well

as by the City's failure to train and supervise its officers concerning the interaction with

mentally ill persons. The Estate also asserted claims based on Michigan law against Officers

Scheffler, Cheplick, and Tanguay and Corporal O'Connor for gross negligence and assault

and battery.

The defendants moved for summary judgment, and on March 14, 2003, the district

court entered an order granting in part and denying in part the motion. With regard to the

warrantless entry claim, the court denied the motion as to Officer Scheffler and Corporal

O'Connor, the officers who had kicked in the door to Sowards's apartment. The court

granted the motion as to the other defendants, finding that they were entitled to qualified

immunity. As to the excessive force claim, the court granted the motion for summary

judgment to all defendants, holding that the Fourteenth Amendment claim was not

cognizable and that the Fourth Amendment claim failed because the officers' actions were

justified as a matter of law.

The district court also granted summary judgment as to the substantive due process

claim because the Estate had failed to produce evidence that the individual defendants acted

with deliberate indifference or recklessness.  With respect to the municipal liability claim based on Corporal O'Connor's alleged violation of the police department's policy concerning barricaded gunman and hostage situations, the court granted summary judgment to the City because the Estate produced no evidence that Corporal O'Connor's alleged violation of policy by kicking in the apartment door was the City's fault.  The court, however, denied summary judgment on the municipal liability claim based on an the alleged failure of the City to train its officers for encounters with mentally ill individuals.  As to the state law claims, the court dismissed them because they could not be sustained after the court found that the officers' use of deadly force was objectively reasonable and justified under the circumstances.

After the district court's rulings, the only viable claims that remained for the Estate to pursue were: (1) a § 1983 claim against Officer Scheffler and Corporal O'Connor based upon their warrantless entry into Sowards's apartment as a violation of the Fourth Amendment; and (2) a § 1983 claim against the City based on its alleged failure to train its officers for encounters with mentally ill individuals.  Subsequent to the district court's rulings on the motion for summary judgment, the defendants filed a motion in limine to limit the scope of damages available on the remaining claims.  In this motion, the defendants argued that the Estate should not be allowed to recover damages for Sowards's death because neither the alleged Fourth Amendment violation nor the alleged failure to train was the proximate cause of Sowards's death.  The district court granted the motion, holding that the

damages recoverable by the Estate would be limited to those that Sowards suffered as a result of "actual injuries (i.e., physical pain and suffering, mental anguish, etc.) with respect to the illegal entry." If no actual injuries were proven, the Estate would be limited to nominal damages only. The Estate voluntarily dismissed the remaining § 1983 claims, and this appeal followed.

III.

This Court reviews a district court's grant of summary judgment *de novo*. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001). Summary judgment is appropriate when " there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

IV.

"To succeed on a cause of action under 42 U.S.C. § 1983, a plaintiff must establish that: 1) he was deprived of a right secured by the federal Constitution or laws of the United States; 2) the deprivation was caused by a person acting under color of state law; and 3) the

deprivation occurred without due process of the law." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994). With the exception of the two officers who kicked in Sowards's door, Corporal O'Connor and Officer Scheffler, the district court held that the individual defendants were entitled to qualified immunity on all claims in this § 1983 case.

Qualified immunity protects government officials who perform discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). In determining whether qualified immunity is warranted, we employ a three-part test:

> The first inquiry is whether the Plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is "whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights."

*Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*)); *Tucker v. City of Richmond, Ky.*, 388 F.3d 216, 219-220 (6th Cir. 2004).

The initial step in the qualified immunity analysis involves a determination of whether the plaintiff has shown a violation of a constitutionally-protected right. A negative answer to this question ends the inquiry concerning qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

> [I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Id.* "If the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Id.* at 205. Qualified immunity is an affirmative defense that must be pleaded by the defendant. *Harlow*, 457 U.S. at 815.

*Fourth Amendment Claim for Excessive Force*

With regard to the excessive force claim, the district court granted summary judgment to all the individual defendants, holding that, as a matter of law, the officers' actions were objectively reasonable under the circumstances, and therefore no constitutional violation had occurred. A Fourth Amendment violation in the context of excessive force occurs when officers use more force than is "reasonably necessary" under the circumstances. *Cox v. Treadway*, 75 F.3d 230, 235 (6th Cir. 1996). This type of claim is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* at 396 (citations and internal quotation

marks excluded). Analysis of an excessive force claim also requires evaluating "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The "reasonableness" is judged from the perspective of the officer on the scene, not with "the 20/20 vision of hindsight." *Id.* The test is an objective one. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397(citations omitted).

This court analyzes an excessive force claim by dividing the facts into temporal segments. *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996); *Boyd v. Baeppler*, 215 F.3d 594 (6th Cir. 2000). "The 'segmenting' rules of *Boyd* and *Dickerson* divide[] the analysis of the use of deadly force from the analysis of possible erroneous actions taken by the officers prior to shots being fired." *Claybrook v. Birchwell*, 274 F.3d 1098, 1104 (6th Cir. 2001). Thus, in this case, the excessive force claim is analyzed from the time Sowards pointed the gun at the officers who were in a small apartment hallway, after and separate from the facts surrounding the warrantless entry claim.

The Estate maintains that there is evidence creating a genuine issue of material fact as to whether the officers' use of deadly force was reasonable, and, therefore, granting summary judgment on the excessive force claim was incorrect. The thrust of the Estate's argument is that the district court failed to sufficiently weigh evidence that the Estate

contends supports its assertion that Sowards did not fire the handgun that was found near his body in the apartment. The Estate relies on the following evidence: Sowards's fingerprints were not found on the gun; no discernible blood was found on the gun; the bullets Sowards purportedly shot were not found; other than the ammunition already in the handgun, none was found in Sowards's apartment; and two people close to Sowards stated that he hated guns. The Estate also contends that the issue of whether Sowards or the officers shot first is critical to the excessive force claim and that the foregoing evidence creates a genuine issue of material fact as to who shot first.

The district court considered the evidence specified by the Estate but found that whether viewed separately or collectively, it did not create a genuine issue of material fact. The court reasoned that the "alleged discrepancies" amounted to nothing more than a scintilla of evidence to support the Estate's contention that Sowards did not threaten the officers with the gun and did not contradict the officers' consistent testimony and other physical evidence. The physical evidence identified by the court and seemingly ignored by the Estate includes the two shell casings from the handgun found in the immediate area, the handgun found in Sowards's apartment, and the bullet holes allegedly made by Sowards's gun fire. Additionally, the district court considered the "dispute" over who shot first, Sowards or the officers, and concluded that the dispute was immaterial to the excessive force analysis.

All of the officers on the scene testified that when the apartment door was kicked in, Sowards pointed a handgun at them through the doorway opening. We agree with the district

court that the evidence that the Estate promotes is a mere scintilla and is insufficient to create

a genuine issue of material fact as to whether Sowards threatened the officers with the gun.

Whether Sowards shot first or did not fire the gun at all is immaterial to whether the officers'

actions were reasonable under the circumstances. The issue is whether Sowards threatened

the officers with the gun at close range such that they were justified in using deadly force in

self defense. *Boyd*, 215 F.3d at 600 ("That the defendants did not see or hear Boyd fire the

weapon does not affect whether the police officers, acting reasonably under the

circumstances known to them, acted in defense of their own safety and the safety of officers

through the use of deadly force."). The district court was correct in finding that the officers'

use of deadly force was objectively reasonable as a matter of law.

The Estate alternatively argues that even if the officers were justified in firing the first

round of shots, they were not justified in firing the second round of shots after they had taken

cover because Sowards did not pose the same serious threat of physical harm. The estate

contends that the district court ignored the opinion testimony of Louis A. Mayo, Ph.D. ("Dr.

Mayo"). The district court did not analyze the shooting in terms of a first and second round

of shots. Nevertheless, its reasoning applies equally in analyzing both rounds.

All the officers testified that Sowards pointed the gun at them a second time. Dr.

Mayo opined that even if Sowards pointed a gun through the door opening of his apartment,

the officers were not in imminent danger because they had taken cover. However, the fact

that the officers may have taken cover behind walls does not mean that they were no longer

in imminent danger.  In analyzing situations such as this, we must be careful to

> avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene.  We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day.  What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).  In light of the threat Sowards posed to the officers on the scene and residents of the apartment house and the rapidity with which the events unfolded, we find that there is no material issue of fact that the officers acted reasonably in firing a second round of shots.

*Substantive Due Process Claim*

The Estate appeals the award of summary judgment to each of the officers and defendant Meschke on the substantive due process claim.  The substantive due process claim is based on the officers' decision to kick in the apartment door without first obtaining more information about the occupant and their failure to obtain medical assistance for Sowards until several hours after the shooting occurred.

Substantive due process protects individuals against the arbitrary and oppressive exercise of government power.  *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)

(citing *Daniels v. Williams,* 474 U.S. 327, 331 (1986)). The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government.'" *Id.* at 845 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). To establish a Fourteenth Amendment substantive due process violation, a plaintiff must show that the state acted with the requisite culpability. *Ewolski v. City of Brunswick,* 287 F.3d 492, 510 (6th Cir. 2002). The Supreme Court "has repeatedly instructed that the Fourteenth Amendment protects only against abuse of executive power which 'shocks the conscience." *Id.* (citing *Lewis*, 523 U.S. at 846). The "shocks the conscience" standard ranges from more than mere negligence at one end of the scale to conduct that intends to injure at the other end. *Id.* (citations omitted).

Whether conduct falling between these two levels "shocks the conscience" depends upon the circumstances in each case. *Id.* In a pretrial detention setting, for example, we have found that "the fault requirement for a due process violation may be satisfied by showing that the state officials were deliberately indifferent to the basic medical needs of detainees." *Id.* (citations omitted). However, the Supreme Court has held that "even 'deliberate indifference' is insufficient to demonstrate a Fourteenth Amendment violation on the basis of police conduct during a high speed chase." *Id.* (citing Lewis, 523 U.S. 854). "[T]he critical question in determining the appropriate standard of culpability is whether the circumstances allowed the state actors time to fully consider the potential consequences of

their conduct. As the *Lewis* court explained, the deliberate indifference standard 'is sensibly employed only when actual deliberation is practical.'" *Id.*(citations omitted).

The district court assumed without deciding that the "deliberate indifference" standard should be applied as the required level of culpability in this case. We find that based on the circumstances in this case, application of the "deliberate indifference" standard was appropriate. "Deliberate indifference has been equated with subjective recklessness, and requires the § 1983 plaintiff to show that the state official knows of and disregards an excessive risk to [the victim's] health or safety." *Id*. at 513. The conduct in this case does not rise to that level.

The Estate has not made clear how the failure to obtain more information about Sowards before kicking in the door amounted to recklessness or a knowing disregard of an excessive risk to Sowards's health or safety. Nor has the Estate shown how that situation would have been different if the officers had obtained such additional information.

The circumstances surrounding the decision to delay medical attention for Sowards until after the apartment building was evacuated also do not reflect that the officers acted with deliberate indifference toward Sowards's needs. The officers were uncertain whether Sowards had been shot and was incapacitated or whether he had just been wounded and had retreated into the apartment. Even if he had been wounded, he still would have posed a threat to the officers in light of his threatening behavior prior to the shooting. Defendant Meschke,

the commanding officer after the shooting, testified that he questioned the officers on the scene, and they all stated that they were unsure whether Sowards had been shot. Defendant Meschke also testified that he chose to evacuate the building before letting his officers enter "[b]ecause it was my assumption that there was a very good possibility that we had an active shooter, by that I mean, someone that was alive and capable of shooting back. And I would never and it never will be my decision to get somebody else injured."

This is a case in which the officers were called upon to consider the risks before them and then from those risks choose the course to follow. In such a case, "a plaintiff must show that the police knowingly and unreasonably opted for the course of conduct that entailed a substantially greater total risk than the available alternatives." *Id.* at 515. The Estate has not made such a showing in this case.

*Municipal Liability*

The Estate contends that the City is liable for the officers' alleged violation of the barricaded gunman and hostage situations policy and that the district court erred in granting summary judgment on this issue.

In order to hold a municipality liable for a constitutional violation under § 1983, a plaintiff must establish that a government policy or custom was the cause of the alleged unconstitutional conduct. *Monell, v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). There must be a causal link between the alleged unconstitutional policy or custom

and the specific constitutional violation alleged to have occurred. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6ᵗʰ Cir. 1993). Without the requisite link, liability cannot attach to the City.

The district court was correct in granting summary judgment to the City on the Estate's claim that the officers violated the barricaded gunman and hostage situations policy. Even if the policy applied and its violation rose to a constitutional dimension, the Estate has failed to allege facts indicating the City's responsibility for the alleged constitutional violation. The Estate must demonstrate that the City's "deliberate conduct [was] the moving force behind the violation." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6ᵗʰ Cir. 2004) (citations and internal quotation marks omitted). There is no showing of a causal link to establish liability on the part of the City.

*District Court's Limitation on Recoverable Damages*

After the district court's summary judgment rulings, two viable claims remained for the Estate to pursue: a claim for warrantless entry against Officer Scheffler and Corporal O'Connor and a claim that the City failed to adequately train its officers for encounters with mentally ill persons. Prior to trial, the defendants filed a motion in limine to exclude damages related to Sowards's death. The district court granted the motion and limited compensatory damages to those actual injuries suffered by Sowards as a result of the invasion of privacy claim only. The Estate contends that the district court erred in precluding

the recovery of damages for Sowards's death and argues that a but-for causation standard should apply in a § 1983 case, not the proximate cause standard employed by the district court.

The district court reasoned that to recover damages for a claim brought pursuant to § 1983, the alleged improper conduct must be the proximate cause of the plaintiff's injuries. Applying proximate cause principles, the district court concluded that neither the illegal entry into the apartment nor the City's failure to adequately train its officers for encounters with mentally ill persons was the proximate cause of the shooting. Sowards's own actions in threatening the officers with the handgun are what led to his injuries and death. The district court appropriately recognized that "proximate causation is an essential element of a § 1983 claim for damages." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994) (citing *Doe v. Sullivan County, Tenn.*, 956 F.2d 945, 950 (6th Cir. 1992)). "[A] violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury." *Id.*; *Ellis v. Washington County & Johnson City, Tenn.*, 198 F.3d 225, 226 (6th Cir. 1999) (affirming summary judgment in a § 1983 action where plaintiff had failed to show proximate causation).

In reaching its conclusion that the warrantless entry was not the proximate cause of Sowards's death, the district court relied primarily on the Third Circuit's decision in *Bodine v. Warwick*, 72 F.3d 393 (3rd Cir. 1995), in which the court held that the illegal entry into a suspect's home by officers did not automatically expose those officers to liability for any

injuries that the suspect may have suffered as a result of excessive force employed during the

arrest. The court determined that if the officers' use of force in arresting the suspect was

reasonable in light of the plaintiff's struggle to resist arrest, the plaintiff's conduct would be

the intervening cause of the injuries, and the illegal entry could not be deemed the proximate

cause of those injuries. The court stated:

> [E]ven if the entry was unlawful, this would mean, under basic principles of tort law, that the troopers would be liable for the harm "proximately" or "legally" caused by their tortious conduct (i.e., by their illegal entry). *See e.g., Restatement (Second) of Torts* §§ 431 and 871 cmt. 1 (1965 & 1979). They would not, however, necessarily be liable for all of the harm caused in the "philosophic" or but-for sense by the illegal entry. *See, e.g., Restatement (Second) of Torts* § 431 and cmt. a (1965). Among other things, they would not be liable for harm produced by a "superseding cause." *See, e.g., Restatement (Second) of Torts* §§ 440-453 (1965). And they certainly would not be liable for harm that was caused by their non-tortious, as opposed to their tortious, "conduct," such as the use of reasonable force to arrest Bodine.

*Id*. at 400. The *Bodine* court illustrated its point by giving the following example:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence. Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him. Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful? The obvious answer is "no." *See George v. City of Long Beach*, 973 F.2d 706 (9th Cir. 1992), *cert. denied*, 507 U.S. 915, 113 S. Ct. 1269, 122 L. Ed. 2d 664(1993). The suspect's conduct would constitute a "superseding" cause, *see Restatement (Second) of Torts* § 442 (1965), that would limit the officer's liability. *See id.* § 440.

*Id.*

The reasoning of the Third Circuit is persuasive and supports the district court's

finding that neither the illegal entry nor the inadequacy of officer training was the proximate

cause of Sowards's death, and also supports the district court's limitation on the damages

recoverable based on that finding. Sowards's own conduct of pointing the handgun toward

the officers was the intervening or superseding cause that set in motion the events that

ultimately led to his death. Therefore, the district court was correct in limiting the damages

to only those actual injuries Sowards suffered as a result of the warrantless entry.

The same reasoning applies equally to the limitation of damages recoverable on the

failure to adequately train claim against the City.

> [T]he inadequacy of police training may serve as the basis for § 1983 liability
> only where the failure to train amounts to deliberate indifference to the rights
> of persons with whom the police come into contact . . . . Only where a
> municipality's failure to train its employees in a relevant respect evidences a
> "deliberate indifference" to the rights of its inhabitants can such a shortcoming
> be properly thought of as a city "policy or custom" that is actionable under §
> 1983. . . . Only where a failure to train reflects a "deliberate" or "conscious"
> choice by a municipality - - a "policy" as defined by our prior cases - - can a
> city be liable for such a failure under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989) (citations omitted). In order for

liability to attach in this type of circumstance, "the identified deficiency in a city's training

program must be closely related to the ultimate injury." *Id.* at 391. A plaintiff must "prove

that the deficiency in training actually caused the police officers' indifference" to the rights

or needs of the person harmed. *Id.* For this reason, the injuries based on the inadequacy of

training claim, if any, are those stemming from the illegal entry, not the shooting.

Again, the district court correctly found that the failure to adequately train was not the proximate cause of the shooting and appropriately limited the damages recoverable to those stemming from the illegal entry, not Sowards's death. The City, then, can only be held liable to the extent its failure to train caused Corporal O'Connor and Officer Scheffler to act with deliberate indifference toward Sowards's rights by entering the apartment without a warrant.

*State Law Claims for Gross Negligence and Assault and Battery*

Under Michigan law, specifically the Michigan Governmental Immunity Act, Mich. Comp. Laws § 691.1407, governmental employees are generally immune from tort liability for injuries they cause during the course of their employment. To receive such immunity, the employee must be acting within or have a reasonable belief that he is acting within the scope of his authority. Mich. Comp. Laws § 691.1407. However, an exception to this general rule of immunity applies when an employee's conduct amounts to gross negligence that is the proximate cause of the injury. *Id.* "Proximate cause" for this exception means "[t]he one most immediate, efficient, and direct cause" of the plaintiff's injury. *Id.*; *Robinson v. City of Detroit*, 613 N.W.2d 307, 319 (Mich. 2000). Under the Michigan statute, "gross negligence" is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407.

The Estate contends that the entry into Sowards's apartment without a warrant, the failure to follow policy for providing medical attention, and the failure to perform a background check when they knew they were dealing with an irrational person amount to gross negligence. Based upon the circumstances described and discussed above, the delay in providing medical attention to Sowards was justified and does not rise to the level of gross negligence. As to the warrantless entry claim, the district court correctly held that while the illegal entry might be a violation of the Fourth Amendment, it does not meet the statutory definition of gross negligence under Michigan law. Further, the warrantless entry was not the proximate cause of Sowards's death; Sowards's own threatening actions with the handgun were a superseding cause that gave rise to the officers' justified action of returning gunfire once they were fired upon. Likewise, the officers' failure to obtain additional information about Sowards does not constitute gross negligence, and it too was not the proximate cause of Sowards's death.

The Estate also contends that the district court erred in granting summary judgment on the assault and battery claim. Under Michigan law, assault and battery is an intentional tort. *Smith v. Stolberg*, 586 N.W.2d 103 (Mich. Ct. App. 1998), and governmental immunity is not available to employees who commit intentional torts. Mich. Comp. Laws § 691.107. However, "[g]overnmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified." *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). The district court found, and we agree, that the

officers' use of force in this case was reasonable and justified.  Therefore, the same result is

warranted under Michigan law, and the assault and battery claim cannot stand.

　　For the foregoing reasons, we **AFFIRM** the district court's judgment.