[Cite as *Hayes v. Columbus*, 2014-Ohio-2076.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Don M. Hayes, Administrator et al., | : | |
| Plaintiffs-Appellants, | : | |
| v. | : | No. 13AP-695 |
| | | (C.P.C. No. 09CV-8426) |
| City of Columbus et al., | : | |
| | | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on May 15, 2014

*Moore & Yaklevich,* and *W. Jeffrey Moore,* for appellants.

*Richard C. Pfeiffer, Jr.,* City Attorney, *Westley Phillips* and *Tim Mangan,* for appellee Frederick Hannah.

APPEAL from the Franklin County Court of Common Pleas

CONNOR, J.

{¶ 1} Plaintiffs-appellants, Don M. and Elaine V. Hayes, as the administrators of the estate of Edward C. Hayes, appeal from a judgment of the Franklin County Court of Common Pleas granting the Civ.R. 56 motion for summary judgment of defendant-appellee, Frederick Hannah ("Officer Hannah"). Plaintiffs assign the following sole assignment of error for our review:

> The trial court erred in granting Summary Judgment to the Defendants on the issue of qualified immunity.

{¶ 2} Because Officer Hannah was statutorily immune from liability pursuant R.C. 2744.03, we affirm.

## I.    FACTS & PROCEDURAL HISTORY

{¶ 3} Plaintiffs filed a complaint against Officer Hannah, the city of Columbus, and the city of Columbus, division of police, on June 4, 2009. The complaint asserted

claims for assault, battery, wrongful death, and intentional infliction of emotional distress. The claims arose from a June 6, 2008 incident, where Officer Hannah shot Hayes twice, resulting in Hayes' death.

{¶ 4} At the time of the incident, Officer Hannah was working as a police officer for the city of Columbus. Officer Hannah had been employed by the Columbus Police Department since 1999. In the summer of 2008, Officer Hannah was working as a member of the Summer Safety Initiative ("SSI") team for zone 5. The SSI was an anti-violence program designed to improve neighborhood safety through community policing, strategic crime analysis, increased visibility, and enforcement of the law. One of the goals of the SSI was to get guns off of the streets of Columbus. Zone 5 encompassed the near east side of Columbus. The zone 5 team was lead by Sergeant Richard Ketcham, and consisted of Officer Hannah, Officer Matthew Baker, Officer Robert Vass, Officer Jack Adkins, Officer Daniel Yap, and Officer James France.

{¶ 5} On the evening of June 6, 2008, Officers Vass and Adkins were acting as a scout car for the zone 5 team, and had parked their unmarked car in a parking lot of the Mount Vernon Plaza Apartments, a high crime area which had been targeted by the zone 5 team in the past. Officers Vass and Adkins wore plain clothes and were in an unmarked vehicle. Officer Vass aired over the radio that he was observing a suspicious car in the parking lot, noting "that a group of people [were] mingling around a car that was backed into a parking spot and had its taillights on." (Hannah Affidavit, ¶ 15.) Officer Vass suggested that the uniformed officers drive over and investigate the situation.

{¶ 6} At 10:54 p.m., Officer Hannah drove his marked police cruiser into the parking lot where the suspect car was located. Officer Baker was riding as a passenger in Officer Hannah's cruiser. As Officer Hannah entered the parking lot, the suspect car moved forward a couple of feet, then stopped. Officer Hannah "shined the spotlight of [his] cruiser into the interior of the suspect car." (Hannah Affidavit, ¶ 19.) Officer Hannah could see four male occupants in the car

{¶ 7} The occupants of the car were Edward Hayes ("Hayes"), the decedent, Dwayne Courtney Hayes, the decedent's brother, Lester Joseph, the decedent's cousin, and Dwight Jackson, a family friend of the Hayes'. That evening, Jackson possessed a .380-caliber Hi-Point firearm, which was later recovered from the center console area of

the car, Joseph possessed a .09-caliber Smith and Wesson, and Hayes possessed a .45-caliber Llama. The men were from New Orleans, Louisiana, and had traveled to Columbus three weeks prior to the shooting. The men went to the Mount Vernon apartment complex that evening to allegedly sell "some guns to some guys from New York." (Dwayne Courtney Hayes Deposition, 23.) When the marked police cruiser pulled up, Hayes allegedly "push[ed] the gun down in his pocket," and said "get away from this car as fast as possible." (Jackson Deposition, 56.)

{¶ 8}  As Officer Hannah had the spotlight on the car, he saw the rear passenger-side door of the car open up, causing the dome light of the car to illuminate. Officer Hannah then saw Hayes "lean down with his shoulders and head going down toward his knees and his lap. Edward Hayes then came back up fully upright in a seated position." (Hannah Affidavit, ¶ 21.) Based on his training and experience as a police officer, Officer Hannah believed that Hayes' movements were consistent with someone picking up a weapon or other contraband off the floor of the car. Officer Hannah said to Officer Baker "Watch the guy in the backseat!" (Hannah Affidavit, ¶ 21.)  Officer Baker and Officer Hannah then exited their cruiser; Officer Baker approached the driver's side of the suspect car and Officer Hannah approached the passenger side. Hayes then exited the rear passenger-door of the suspect car.

{¶ 9}  As Officer Hannah and Hayes faced each other, Officer Hannah "immediately noticed that [Hayes] was holding a large handgun in his left hand, down to his side, openly displayed in clear view." (Hannah Affidavit, ¶ 24.) Officer Hannah then drew his service firearm, "and loudly and clearly shouted at Edward Hayes, 'Drop the fucking gun! Drop the fucking gun! Drop the fucking gun!' " (Hannah Affidavit, ¶ 26.) Officer Baker then yelled " 'gun' out loud." (Hannah Deposition, 93.) Officer Hannah believed Officer Baker was referring to Hayes' gun, but Officer Baker was actually notifying Officer Hannah that he had discovered the .380-caliber Hi-Point near the center console of the vehicle. Hayes did not obey Officer Hannah's command to drop the gun. Rather, Hayes backed up, turned around, and ran in a northeasterly direction out of the parking lot towards one of the apartment buildings. Hayes did not run at full speed. Officer Hannah ran after Hayes.

{¶ 10} Officer Hannah noted that he had encountered numerous armed suspects during his career, and that most suspects when ordered to stop and drop their weapon would typically throw their weapon down and either drop to the ground or run away as fast as possible. Hayes acted much differently than any of the armed suspects Officer Hannah had previously encountered, as he retained his weapon, despite Officer Hannah's commands, and ran away, but at less than full speed. Hayes' odd conduct made Officer Hannah "even more apprehensive about what Edward Hayes intended to do once [Officer Hannah] began to pursue him." (Hannah Affidavit, ¶ 27.)

{¶ 11} At the beginning of the foot chase, the area was well lit, and Officer Hannah "could clearly see the gun that Edward Hayes was carrying in his left hand down at his left side as he was running. [Officer Hannah] loudly ordered him to stop and to drop his gun, but he kept running." (Hannah Affidavit, ¶ 28.) Hayes initially "had a pretty good lead on" Officer Hannah. (Hannah Deposition, 94.) However, Hayes then slowed down, looked back at Officer Hannah "over his left shoulder, and turned his gun toward [Officer Hannah] in a backward motion as if he was trying to get [Officer Hannah] in his gun's sights." (Hannah Affidavit, ¶ 29.) Hayes was turning to his left while "he's running. So he's running but he's turning backwards," and turning "his gun to his left in an attempt to find" Officer Hannah. (Hannah Deposition, 95.) Officer Hannah stated that Hayes got "pretty far around, enough to where [Officer Hannah] had a very good view of the weapon." (Hannah Deposition, 95.) Hayes then brought his gun forward and continued running.

{¶ 12} Hayes then "ran along the brick wall of the apartment building into an area that was very dark." (Hannah Affidavit, ¶ 30.) After running for another 50 to 60 feet, Hayes slowed down again, almost to a complete stop, and "started turning left toward [Officer Hannah] in the same manner as he had done seconds earlier." (Hannah Affidavit, ¶ 31.) Officer Hannah believed that Hayes "was still carrying his handgun and that he was turning toward [Officer Hannah] with the intent of firing his weapon at" Officer Hannah. (Hannah Affidavit, ¶ 31.) As Hayes turned left, Officer Hannah attempted to get out of the line of fire by moving slightly right. However, fearing for his life, Officer Hannah fired his gun at Hayes twice, aiming for center mass. Officer Hannah stated that Hayes was not

able to point the gun directly at him, because "[h]e never got all the way around." (Hannah Deposition, 98.)

{¶ 13} Officer Hannah was approximately ten to fifteen feet away from Hayes when he fired his weapon. Officer Hannah fired his weapon because he "did not believe that [he] had any alternative means to protect [himself]." (Hannah Affidavit, ¶ 33.) Officer Hannah noted that all of Hayes "movements and actions led [Officer Hannah] to believe that he posed a direct and immediate threat to [his] life," as Hayes was "in a dark area of the apartment complex and [Officer Hannah] never saw him drop his gun or throw it aside." (Hannah Affidavit, ¶ 34.) The entire encounter, from when Officer Hannah first encountered Hayes outside of the vehicle, until shots were fired, lasted approximately ten seconds.

{¶ 14} Immediately after the shooting, Officer Hannah aired officer in trouble, shots fired, and suspect down calls over the police radio. He also aired that a medic was needed. Officer Hannah began searching for Hayes' gun and "was surprised when [he] didn't find it under his body or in the immediate area where he was laying." (Hannah Affidavit, ¶ 35.) Officer Hannah heard Hayes choking on his own blood, so he turned him face down to clear his windpipe. As other officers began to respond to the area, Officer Hannah told them "that Edward Hayes had a gun but that [Hannah] could not find the gun." (Hannah Affidavit, ¶ 38.) The officers began retracing the path of the foot chase, and one of the other officers found the .45-caliber Llama handgun on the ground between two bushes located along the route of the foot chase. Forensic testing revealed that Hayes' DNA was present on the .45-caliber Llama handgun. Hayes died as the result of the gunshot wound to his posterior chest wall.

{¶ 15} On July 2, 2009, the defendants notified the trial court that they had filed a notice of removal of the action to federal district court, as plaintiffs were pursuing claims under 42 U.S.C. § 1983. In the federal action, plaintiffs filed a motion to remand the case to the Franklin County Court of Common Pleas, "stating that, as of now, they are pursuing only state law claims and are not pursuing a claim under 42 U.S.C. § 1983 or any other federal claims." (July 9, 2009 Order.) The federal district court granted plaintiffs' motion, and remanded the case to the trial court. On December 21, 2009, plaintiffs filed a notice of dismissal pursuant to Civ.R. 41(A), notifying the court that plaintiffs were dismissing the

city of Columbus and the city of Columbus, division of police, from the action without prejudice.

{¶ 16} On May 16, 2011, Officer Hannah filed a Civ.R. 56 motion for summary judgment. Officer Hannah asserted that he was entitled to immunity from plaintiffs' state law claims under R.C. 2744.03, which provides employees of political subdivisions with immunity from liability for injury or death which results from an act or omission done in connection with a governmental or proprietary function. Officer Hannah noted that none of the exceptions to immunity were applicable, as Officer Hannah reasonably believed that his life was in danger when he fired his service weapon at Hayes.

{¶ 17} Plaintiffs filed a memorandum contra Officer Hannah's motion for summary judgment on July 8, 2011. Plaintiffs asserted that Officer Hannah was not justified in his use of force, as Hayes was unarmed when Officer Hannah shot him in the back. Plaintiffs also asserted that testimony from three eyewitnesses to the shooting, Nakia Fenner, Barry Edney, and Phillip Locke, established that Officer Hannah shot Hayes in the back without provocation. As such, plaintiffs asserted that genuine issues of material fact existed regarding whether Officer Hannah's conduct fell into the exception to immunity listed in R.C. 2744.03(A)(6)(b). Officer Hannah filed a reply to plaintiffs' memorandum contra on July 20, 2011.

{¶ 18} The trial court issued a decision and entry granting Officer Hannah's motion for summary judgment on April 24, 2013. The court noted that, viewing the facts of the case objectively, "no jury could possibly find that Officer Hannah acted unreasonably or with malicious purpose, in bad faith or in a wanton or reckless manner when he responded to the clear threat by the armed Edward Hayes." (Decision & Entry, 13.) The court further concluded that, because "the actions of a police officer must be judged objectively at the time that force was employed, and without regard to motivation or intent," the statements of Fenner, Edney, and Locke did not demonstrate a genuine issue of material fact in the case. (Decision and Entry, 15.) The court thus determined that Officer Hannah was statutorily immune from plaintiffs' claims under R.C. 2744.03.

## II.    STANDARD OF REVIEW

{¶ 19} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a

trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 20} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 21} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.* If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party. *Id.*

## III.    STATUTORY IMMUNITY R.C. 2744.03

{¶ 22} Plaintiffs' sole assignment of error asserts that the trial court erred in granting Officer Hannah summary judgment on the issue of qualified immunity. The federal doctrine of qualified immunity, embodied in 42 U.S.C. § 1983, permits a plaintiff to bring an action against a person who, acting under the color of law, deprived the

plaintiff of a constitutionally guaranteed federal right. *See Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992). Qualified immunity thus applies only to federal claims. *See Bodager v. Campbell*, 4th Dist. No. 12CA828, 2013-Ohio-4650, ¶ 30; *Roe v. Franklin Cty.*, 109 Ohio App.3d 772, 785 fn.7 (10th Dist.1996) (noting that there are "two separate and distinct concepts of governmental immunity, the statutory immunity provided by R.C. Chapter 2744, which applies to state law claims, and the federal doctrine of qualified immunity, which applies solely to federal claims"). Plaintiffs did not assert any federal claims in their complaint, as they asserted only state law claims, and the sole issue before the trial court was whether Officer Hannah was statutorily immune from liability under R.C. 2744.03. Accordingly, in the interest of justice, we construe plaintiffs' assignment of error to assert that the trial court erred in granting summary judgment to Officer Hannah on the basis of statutory immunity.

{¶ 23} R.C. Chapter 2744, the Political Subdivision Tort Liability Act, sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their employees. *Supportive Solutions, L.L.C. v. Electronic Classroom of Tomorrow*, 137 Ohio St.3d 23, 2013-Ohio-2410, ¶ 11. The statute "is the General Assembly's response to the judicial abrogation of common-law sovereign immunity. Its manifest purpose is the preservation of the fiscal integrity of political subdivisions." *Estate of Graves v. Circleville*, 124 Ohio St.3d 339, 2010-Ohio-168, ¶ 12, citing *Wilson v. Stark Cty. Dept. of Human Servs.*, 70 Ohio St.3d 450, 453 (1994).

{¶ 24} Under R.C. 2744.03(A)(6), an employee of a political subdivision will be immune from liability for "injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function," unless one of the three exceptions to that immunity applies. A governmental function includes the provision of police services. R.C. 2744.01(C)(2)(a). It is undisputed that Officer Hannah, as a police officer for the city of Columbus, was an employee of a political subdivision at the time of the incident. R.C. 2744.03(A)(6) provides the following exceptions to immunity:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

{¶ 25} Officer Hannah was acting within the scope of his employment as a police officer when he pursued Hayes, an armed and fleeing suspect, and plaintiffs have not alleged that liability is expressly imposed upon Officer Hannah under another section of the revised code. Plaintiffs thus concede that the only possible "applicable exception to immunity is (b) that the acts of Defendant Hannah were wanton or reckless or done in a wanton or reckless manner." (Appellants' brief, 14.) Accordingly, Officer Hannah is entitled to immunity under R.C. 2744.03(A)(6)(b) unless plaintiffs can demonstrate that Officer Hannah's actions were done with a malicious purpose, in bad faith, or in a wanton or reckless manner. *See Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 23 (noting that "[b]y implication," R.C. 2744.03(A)(6)(b) provides that "an employee is immune from liability for negligent acts or omissions").

{¶ 26} The terms used in R.C. 2744.03(A)(6)(b) "are not interchangeable." *Anderson* at ¶ 40. Malicious purpose "means the 'willful and intentional design to do injury, or the intentional or desire to harm another, usually seriously, through * * * unlawful or unjustified' conduct." *VanDyke v. Columbus*, 10th Dist. No. 07AP-918, 2008-Ohio-2652, ¶ 13, quoting *Cook v. Hubbard Exempted Village Bd. of Edn.*, 116 Ohio App.3d 564, 569 (11th Dist.1996). "Bad faith denotes a 'dishonest purpose, moral obliquity, conscious wrong doing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.' " *Id.*, quoting *Jackson v. McDonald*, 144 Ohio App.3d 301, 309 (5th Dist.2001). Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is a great probability that harm will result. *Anderson* at paragraph three of the syllabus. Reckless

conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. *Id.* at paragraph four of the syllabus.

{¶ 27} It is constitutionally unreasonable for an officer to "seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "[W]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.* Accordingly, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

{¶ 28} Our Fourth Amendment jurisprudence, which is helpful in analyzing statutory immunity claims, "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). In determining whether the force used violates the Fourth Amendment, courts must examine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* at 397. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. " 'A court must avoid substituting its personal notions of proper police procedure for the instantaneous decision made by the officer at the scene.' " *Kendzierski v. Carney*, 9th Dist. No. 22739, 2005-Ohio-6735, ¶ 27, quoting *Gammon v. Blakeley*, 8th Dist. No. 72175 (Dec. 4, 1997). *See also Graham* at 396 (noting that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

{¶ 29} Officer Hannah explained that police department policy provided that an officer could use deadly force when such force was objectively reasonable, and when there was an "imminent threat of serious physical harm or death to [the officer] or a third person." (Hannah Deposition, 30.) "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 Fed.Appx. 370, 373 (6th Cir.2011), citing *Estate of Soward v. Trenton*, 125 Fed.Appx. 31, 38 (6th Cir.2005).

{¶ 30} Viewing the totality of the evidence presented in this case, Officer Hannah acted reasonably, and in line with police department policy, when he fired his service firearm at Hayes. Officer Hannah saw that Hayes possessed a firearm when Hayes first exited the vehicle, saw the gun in Hayes left hand as Hayes was running, and saw Hayes slow down and turn the gun back towards Officer Hannah during the first part of the chase. Officer Hannah commanded Hayes to drop the gun when Hayes first stepped out of the car, but Hayes ignored Officer Hannah's command, and instead ran away while continuing to possess the firearm. When Hayes slowed down for the second time, in a darkened area along the brick wall of the apartment building, and began to turn "left toward [Officer Hannah] in the same manner as he had done seconds earlier," Officer Hannah believed that Hayes "was still carrying his handgun and that he was turning toward [Officer Hannah] with the intent of firing his weapon." (Hannah Affidavit at ¶ 31.) Thus, when Officer Hannah fired his weapon at Hayes, Officer Hannah had probable cause to believe that Hayes was armed and posed a threat of serious physical harm to Officer Hannah.

{¶ 31} We are mindful that the entire incident lasted only ten seconds, and Officer Hannah thus had only a moment to decide whether to employ deadly force. Officer Hannah reasonably believed that Hayes was turning towards him with the intent of firing his weapon when Officer Hannah fired his own weapon in response. Accordingly, on the evidence presented, a reasonable juror could only conclude that Officer Hannah acted reasonably in employing deadly force in this situation.

{¶ 32} The fact that Hayes had thrown his gun shortly before Officer Hannah fired his service weapon does not alter our conclusion herein. There is nothing in the record to

demonstrate that Officer Hannah knew that Hayes was unarmed when Officer Hannah fired at him. Officer Hannah averred that during the chase, he never saw Hayes "drop his gun or throw it aside." (Hannah Affidavit, ¶ 34.) Accordingly, the summary judgment evidence demonstrated that Officer Hannah reasonably believed that Hayes was still armed when he began to turn towards Officer Hannah for the second time during the chase.

{¶ 33} Plaintiffs assert that genuine issues of material fact exist regarding whether Officer Hannah saw Hayes throw his gun. They assert that that Officer Hannah "was not truthful when he insisted that he never saw Mr. Hayes throw anything while running." (Appellants' brief, 16.) Exhibit I to plaintiffs' memorandum contra was Officer Yap's June 7, 2008 statement to a homicide detective. The statement, written by the homicide detective, related the following information from Officer Yap:

> Officer Yap stated a 10-3, Officer In Trouble Call, had been aired and several officers were arriving at the scene. He stated Officer Hannah told him the suspect had thrown something down. Officer Yap stated he immediately started retracing the path that Officer Hannah had chased the suspect, which was west of their location. Officer Yap stated he saw the gun at the same time it was found by another officer. Officer Yap stated the gun was a .45 caliber pistol with the name of LLAMA on the grip. He noticed a magazine was seated in the gun.

{¶ 34} In his deposition, Officer Yap stated that when he made contact with Officer Hannah, Officer Hannah told Officer Yap that Hayes "had something in his hand" when he was running. (Yap Deposition, 18.) When asked, "[i]sn't it true you said that Officer Hannah told you the suspect had thrown something," Yap responded "[y]es, I might have said that." (Yap Deposition, 19.) Officer Yap also indicated that he remembered making the statement to the homicide detective, and that it was a true statement. Officer Yap stated that he retraced the path of the foot chase, and that he could not "recall the distance," but found the gun "along the apartment wall." (Yap Deposition, 19.)

{¶ 35} Officer Yap's statement to the homicide detective and Officer Yap's deposition testimony do not establish that Officer Hannah knew that Hayes was unarmed when Officer Hannah fired his shots. Construing Officer Yap's statement in plaintiffs'

favor, it establishes only that Officer Hannah told Officer Yap that Hayes had thrown something. Officer Hannah never stated that Hayes had thrown a gun. As such, even if Officer Hannah had seen Hayes throw something, Officer Hannah had no way of knowing what it was that Hayes had thrown. In such a situation, Officer Hannah was not obligated to gamble with his own life and guess as to whether Hayes had thrown the gun he was carrying or something else.

{¶ 36} Plaintiffs also assert that genuine issues of material fact exist in this case because the three civilian witnesses to the chase "did not see any threatening actions but saw a man stop and obey [Hannah's] request." (Appellants' brief, 15.) Plaintiffs assert that the deposition excerpts from Fenner, Edney, and Locke establish that Officer Hannah shot "Mr. Hayes in the back with no provocation." (Appellants' brief, 16.) The excerpts from these depositions do not create a genuine issue of material fact in this action.

{¶ 37} Plaintiffs attached only excerpts from the depositions of Fenner and Edney to their memorandum contra the motion for summary judgment. Plaintiffs did not file any portion of the Locke deposition until after the trial court issued its decision and entry granting Officer Hannah's motion for summary judgment. Generally, before a deposition may be considered as acceptable evidence under Civ.R. 56(C), the following three requirements must be satisfied: (1) the transcript must be filed with the court or otherwise authenticated; (2) the deponent must sign the deposition or waive signature; and (3) there must be court reporter certification. *Bank of New York Mellon Trust Co. v. Unger*, 8th Dist. No. 97315, 2012-Ohio-1950, ¶ 43, citing Civ.R. 30(E) and (F). Although plaintiffs did not file the transcript of the depositions with the court, or otherwise authenticate the excerpts of the deposition which were attached to their memorandum contra, because Officer Hannah did not object to the improperly submitted deposition excerpts, the trial court properly exercised its discretion to consider those deposition excerpts when ruling on the motion for summary judgment. *See Christie v. GMS Mgt. Co.*, 124 Ohio App.3d 84, 90 (9th Dist.1997), citing *Skidmore & Assoc. Co. v. Southerland*, 89 Ohio App.3d 177, 179 (9th Dist.1993) (noting that "if the opposing party fails to object to improperly introduced evidentiary materials, the trial court may, in its sound discretion, consider those materials in ruling on the summary judgment motion"); *Papadelis v. First Am. Sav. Bank*, 112 Ohio App.3d 576, 579 (8th Dist.1996).

{¶ 38} The excerpts from Edney's deposition demonstrate that Edney could hear Hayes say " 'Please don't shoot me' * * * a few seconds before he got shot." (Edney Deposition, 60.) Edney also stated that after shots were fired, Officer Hannah picked Hayes up by his belt and said " '[d]amn,' " then dropped Hayes back on the ground and kicked him near his upper body. (Edney Deposition, 66.) Edney also stated that after the shooting, the officers were "looking for something, like they was looking for a gun and they couldn't find one right next to where he got shot and killed." (Edney Deposition, 76.)

{¶ 39} Fenner stated that she was too far away from the chase to hear anything, and stated that she "never got close enough to [the chase to] see anything." (Fenner Deposition, 19.) Fenner specifically stated that she never saw if Hayes had anything in his hands during the chase.

{¶ 40} In its entry granting Officer Hannah's motion for summary judgment, the court noted that, although no deposition of Locke had been filed of record, "[p]laintiff's memorandum * * * reference[d] two pages of the deposition of a Phillip Locke." (Decision & Entry, 15.) For purposes of ruling on the motion for summary judgment, the court assumed that "Locke testified as plaintiff[s] stated in [their] memorandum." (Decision and Entry, 15.) Plaintiffs filed excerpts from Locke's deposition two days after the court issued its entry granting Officer Hannah's motion for summary judgment. An appellate court reviewing an award of summary judgment may consider only that evidence which was part of the proceedings before the trial court. *See Wallace v. Mantych Metalworking*, 189 Ohio App.3d 25, 2010-Ohio-3765, ¶ 10-11 (2d Dist.); Civ.R. 56(C). We will consider the quoted portions of the Locke deposition contained in plaintiffs' memorandum contra, as the trial court did when it ruled on the motion for summary judgment.

{¶ 41} In their memorandum contra, plaintiffs noted that Locke stated that he saw Officer Hannah draw his weapon and shoot Hayes in the back. Before Officer Hannah shot Hayes, Locke yelled at Officer Hannah not to shoot. After Officer Hannah shot Hayes, Locke said to Officer Hannah, "you shot the man for running?" (Memorandum Contra, 6.)

{¶ 42} That Officer Hannah shot Hayes in the back is consistent with Officer Hannah's own testimony that Hayes was in the process of turning around, "with his arm swinging backwards from his right to left," when Officer Hannah moved to the right and

fired two shots, aiming for center mass. (Hannah Deposition, 98.) Edney's testimony indicating that, after the shooting, Officer Hannah picked Hayes up by the belt, said "damn," and then dropped Hayes to the ground, was consistent with Officer Hannah's statements indicating that after the shooting he immediately began searching for Hayes' gun and "was surprised when [he] didn't find it under his body or in the immediate area where he was laying." (Hannah Affidavit, ¶ 35.) Such evidence was also consistent with Officer Hannah's statement indicating that Hayes rolled on his back after the shooting and began "choking on his own blood, so [Officer Hannah] turned him face down in an attempt to clear his windpipe." (Hannah Affidavit, ¶ 36.)

{¶ 43} Edney's statement that he heard Hayes yell " '[p]lease don't shoot me,' " and Locke's statement that he personally yelled at Officer Hannah not to shoot Hayes, also do not create genuine issues of material fact regarding whether Officer Hannah's conduct satisfied the R.C. 2744.03(A)(6)(b) exception to immunity. Assuming that Officer Hannah heard Hayes yell " '[p]lease don't shoot me' " and heard Locke yell not to shoot, nothing about those statements would have indicated to Officer Hannah that Hayes had thrown his gun and was unarmed. Thus, even if Officer Hannah heard those statements, Officer Hannah would still have reasonably believed that Hayes was armed, and turning towards Officer Hannah with the gun. Moreover, reviewing the totality of the evidence presented in this action, including that Hayes was armed and had pointed the gun in Officer Hannah's direction during the first part of the foot chase, that Hayes ran from Officer Hannah at less than full speed into a dark area of the apartment complex, and that Officer Hannah shot Hayes when Hayes began to turn towards Officer Hannah in the same manner as he had moments before when he turned his gun towards Officer Hannah, no reasonable juror could conclude that Officer Hannah acted with a malicious purpose, in bad faith, or in a wanton or reckless manner when he fired his weapon at Hayes.

{¶ 44} The "relevant inquiry before the court [was] whether [Officer Hannah], from his own perspective, reasonably had probable cause to believe that he * * * [was] at imminent risk" of serious physical harm when he fired his weapon. *Kendzierski* at ¶ 29. Plaintiffs failed to present evidence to create a genuine issue of material fact regarding whether Officer Hannah's belief that he was in imminent danger of serious physical harm was unreasonable. As such, the trial court correctly determined that on the evidence

presented in this action "no reasonable juror could fail to find that Officer Hannah acted lawfully and reasonably." (Decision and Entry, 16.)

{¶ 45} The trial court correctly determined that Officer Hannah was statutorily immune from liability pursuant to R.C. 2744.03, as the facts of this case do not satisfy the exception to immunity contained in R.C. 2744.03(A)(6)(b). The totality of the evidence demonstrated that Officer Hannah acted in line with police department policy regarding when an officer may employ deadly force. As such, no reasonable juror could find that Officer Hannah acted with a malicious purpose or in bad faith. Furthermore, the record demonstrates that Officer Hannah yelled "[d]rop the fucking gun" multiple times before Hayes started to flee. (Hannah Affidavit, ¶ 26.) As Officer Hannah did shout warnings for Hayes to drop the gun, there is no genuine issue of material fact regarding whether Officer Hannah acted in a wanton manner when he resorted to deadly force herein. *Compare Kendzierski* at ¶ 30 (in determining whether the appellee's conduct fell into the exception to immunity listed in R.C. 2744.03(A)(6)(b), the court concluded that because the appellee had "shouted out at least two warnings for the decedent to stop, [the court found] that appellants * * * failed to demonstrate that appellee failed to exercise any care whatsoever"). Finally, because the Civ.R. 56 evidence demonstrated that Officer Hannah only resorted to deadly force after he reasonably believed that he was in imminent danger of serious physical harm from Hayes, no reasonable juror could find that Officer Hannah's use of deadly force in this case amounted to reckless conduct. Accordingly, there are no genuine issues of material fact and Officer Hannah was entitled to judgment as a matter of law.

{¶ 46} Based on the foregoing, plaintiffs' sole assignment of error is overruled.

## IV. DISPOSITION

{¶ 47} Having overruled plaintiffs' sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and KLATT, JJ., concur.

_____