[Cite as *Estate of Lewis v. Anderson*, 2026-Ohio-2096.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Estate of Donovan L. Lewis, by and through its Administrator, Rebecca Duran, | : | |
| | : | |
| Plaintiff-Appellee, | : | No. 24AP-572 (C.P.C. No. 23CV-1021) |
| v. | : | (ACCELERATED CALENDAR) |
| Ricky R. Anderson et al., | : | |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on June 4, 2026

**On brief:** *Cooper Elliott, Rex H. Elliott, Barton R. Keyes, C. Benjamin Cooper,* and *Kaela King*; *Wright & Schulte, Michael L. Wright, Robert L. Gresham,* and *Richard W. Schulte,* for appellee. **Argued:** *C. Benjamin Cooper.*

**On brief:** *David A. Goldstein Co., L.P.A.,* and *David A. Goldstein,* for appellant, Ricky R. Anderson. **Argued:** *David A. Goldstein.*

APPEAL from the Franklin County Court of Common Pleas

DINGUS, J.

{¶ 1} Defendant-appellant, Ricky R. Anderson, a Columbus Police Officer ("Officer Anderson"), appeals the denial of his motion for summary judgment, in which he asserted statutory immunity from civil liability under R.C. Chapter 2744 for claims arising from the shooting death of 20-year-old Donovan L. Lewis ("Lewis"). The Estate of Donovan L. Lewis, by and through its administrator, Rebecca Duran, Lewis's mother ("the Estate"), is the plaintiff-appellee in this action. After a thorough review of the law and the record, we find that genuine issues of material fact preclude summary judgment in Officer Anderson's favor. Accordingly, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} The following facts are not in dispute. In the early morning hours of August 30, 2022, Columbus Police Department officers Chance Knox ("Sergeant Knox"), Harry Dorsey ("Officer Dorsey"), Jack Randall ("Officer Randall"), and Justin Dodrill ("Officer Dodrill") arrived at Lewis's residence, located at an apartment on Sullivant Avenue, to execute an outstanding arrest warrant. At the time, Lewis was wanted on charges of domestic violence and improper handling of a firearm.

{¶ 3} Body-worn camera (hereinafter "BWC") footage shows that upon arrival, Sergeant Knox announced their police presence while knocking on Lewis's door. Initially, there was no response. However, after several minutes of Sergeant Knox and the other officers shouting commands to come out, two men exited the apartment. Both men were detained. Neither individual was Lewis.

{¶ 4} The officers continued to command that Lewis exit the apartment. At approximately 2:34 a.m., the officers radioed Officer Anderson to join them with his police K-9 partner, Boef. Upon arrival, Officer Anderson announced that anyone left in the apartment should come out, or a K-9 would be sent in. After getting no response, Officer Anderson released Boef into the apartment.

{¶ 5} The BWC footage shows that Boef entered the apartment and proceeded to the kitchen and into a room off the kitchen. Without barking, Boef appears to exit the room beyond the kitchen and return to the front door where Officer Anderson and Sergeant Knox were standing. Officer Anderson instructs Boef to go back in, and Boef again enters a room beyond the kitchen and returns to the officers at the door without barking. Officer Anderson again sent Boef into the apartment. This time, Boef stopped in front of the door beyond the kitchen and began to bark, suggesting that the door had been closed after his original entry.

{¶ 6} At this point, Officer Anderson and the other officers entered the apartment and approached the closed door at the back of the kitchen with guns drawn. While standing in front of the closed door, the BWC footage appears to show Officer Anderson attempting to leash Boef but either failing to do so or opting not to use the leash. Instead, Officer Anderson grabs Boef by the collar with his left hand. While holding onto Boef's collar,

Officer Anderson opened the door with his right hand and then quickly drew his gun with his right hand.

{¶ 7} The BWC footage shows both Officer Anderson and Sergeant Knox having their guns drawn and pointed at a bed in the room beyond. A light from Sergeant Knox's gun illuminates the space and reveals Lewis on the bed, facing the officers. Lewis is positioned with his left knee on the mattress and is pushing himself upward with his left hand. The camera footage further shows Lewis moving his right arm from behind his body toward the front, in the direction of the officers. At that moment, Officer Anderson fired his gun, striking Lewis in the abdomen. Officer Anderson then holstered his gun and remained in the doorway. Sergeant Knox, who was standing next to Officer Anderson, did not fire his gun.

{¶ 8} Officers on the scene, other than Officer Anderson, rendered emergency care to Lewis. Lewis was subsequently transported to the hospital by ambulance where, at 3:19 a.m. he was pronounced dead, having succumbed to the gunshot injury.

{¶ 9} On February 16, 2023, the Estate filed a complaint against Officer Anderson and the four other responding officers. The complaint alleged wrongful death, civil battery, breach of duty, intentional infliction of emotional distress, negligent infliction of emotional distress, failure to render aid, and deprivation of state constitutional and statutory rights. The Estate would later dismiss the action as to all defendants except Officer Anderson.

{¶ 10} Following discovery, Officer Anderson moved for summary judgment, arguing that his use of deadly force was objectively reasonable—or, at a minimum, not wanton or reckless—and that he was therefore entitled to statutory immunity under R.C. Chapter 2744. The Estate opposed the motion.

{¶ 11} On August 22, 2024, the trial court denied Officer Anderson's motion for summary judgment, finding that genuine issues of material fact existed as to whether Officer Anderson acted recklessly and, consequently, whether statutory immunity applied.

## II. Assignment of Error

{¶ 12} Officer Anderson assigns the following sole assignment of error for our review:

> The trial court erred by denying Defendant Ricky Anderson's
> motion for summary judgment because he is entitled to

immunity as a matter of law, and no genuine issue of material fact exists.

## III. Standard of Review: Summary Judgment in Statutory Immunity Cases

{¶ 13} We review a trial court's summary-judgment denial of statutory immunity de novo, applying the same Civ.R. 56 summary-judgment standard as the trial court. *See Hubbell v. Xenia*, 2007-Ohio-4839, ¶ 21. "De novo review means the reviewing court independently analyzes the record while giving no deference to the trial court's decision." *Allen v. Marre*, 2026-Ohio-1186, ¶ 7 (10th Dist.), citing *Johnson v. Am. Italian Golf Assn. of Columbus*, 2018-Ohio-2100, ¶ 13 (10th Dist.).

{¶ 14} Summary judgment is appropriate under Civ.R. 56 when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion, that conclusion being adverse to the party opposing the motion. *See Franks v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-1519, ¶ 5 (10th Dist.); *see also Grafton v. Ohio Edison Co.*, 1996-Ohio-336, ¶ 10.

{¶ 15} On summary judgment, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact. *See Dresher v. Burt*, 1996-Ohio-107, ¶ 17. This burden cannot be satisfied through conclusory assertions; rather, the movant must identify specific evidence of the type permitted under Civ.R. 56(C) affirmatively demonstrating that the nonmoving party lacks evidence to support its claims. *Id.*; *Vahila v. Hall*, 1997-Ohio-259, ¶ 19. If the moving party satisfies this burden, summary judgment is appropriate unless the nonmoving party responds by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial. *Id.*; *Vahila* at ¶ 19; Civ.R. 56(E).

{¶ 16} A fact is material if it " ' "might affect the outcome of the suit under the governing law" ' " of the case. *Oko v. Cleveland Div. of Police*, 2021-Ohio-2931, ¶ 23 (8th Dist.), quoting *Turner v. Turner*, 1993-Ohio-176, ¶ 8, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is 'genuine' only if 'it allows reasonable minds to return a verdict for the nonmoving party.' " *Huntington Natl. Bank v. Blount*, 2013-Ohio-3128, ¶ 32 (8th Dist.), quoting *Sysco Food Servs. of Cleveland v. Titan Devs., Inc.*, 1995 Ohio App. LEXIS 4762, *7 (9th Dist. Oct. 25, 1995).

{¶ 17}  Regarding statutory immunity, "R.C. 2744.03(A)(6) 'sets forth the immunity of political-subdivision employees and the exceptions thereto.' " *Stevens v. Maxson*, 2013-Ohio-5792, ¶ 12 (10th Dist.), quoting *Anderson v. Massillon*, 2012-Ohio-5711, ¶ 20.  This provision generally grants employees of political subdivisions immunity from civil liability for harm they have caused, unless one of the following three exceptions is met: (1) their actions or omissions fall manifestly outside the scope of their employment or official responsibilities, (2) their acts or omissions are malicious, in bad faith, or wanton or reckless, or (3) liability is expressly imposed upon the employee by a section of the Ohio Revised Code.  *See Cramer v. Auglaize Acres*, 2007-Ohio-1946, ¶ 17; R.C. 2744.03(A)(6)(a) through (c).

{¶ 18}  The burden is initially on the employee of a political subdivision to both assert and demonstrate by means of appropriate evidence their entitlement to immunity.  *See Mullins v. Liberty Twp.*, 2022-Ohio-4350, ¶ 45 (7th Dist.); *see also Estate of Cook v. Montville Twp.*, 2024-Ohio-5690, ¶ 9 (DeWine, J., dissenting).  If this burden is so met, then the burden shifts to the plaintiff to demonstrate that one of the above-mentioned exceptions to immunity applies, thereby foreclosing an immunity defense.  *See id.*; *see also Estate of Cook* at ¶ 9.

{¶ 19}  In this case, Officer Anderson asserts—and the Estate does not dispute—that he was, at all relevant times, an employee of the Columbus Police Department, a political subdivision as defined by R.C. 2744.01.  As such, Officer Anderson is entitled to immunity under R.C. 2744.03(A)(6) unless an exception to immunity applies.

{¶ 20}  The Estate contends that Lewis's death resulted from Officer Anderson's reckless actions, thereby invoking an exception to immunity.  The Supreme Court of Ohio has defined recklessness in the context of R.C. 2744.03(A)(6)(b) as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104-105 (1990).  To contrast, negligent conduct involves a lower culpability than reckless conduct and has been defined as " '[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation.' "  *Id.* at ¶ 45 (Lanzinger, J., concurring in part and dissenting in part), quoting *Black's Law Dictionary* (9th Ed. 2009).

{¶ 21} In response to the Estate's assertion that an exception to immunity applies, Officer Anderson argues that, under the circumstances, it was objectively reasonable for him to shoot Lewis. Alternatively, Officer Anderson contends that, even if it was not objectively reasonable to shoot Lewis, his conduct amounted to, at most, negligence, not recklessness.

{¶ 22} In reviewing the parties' respective arguments for and against summary judgment, we are highly cognizant of the fact that, at the summary judgment phase of proceedings, the issue is " 'not whether the [political subdivision] employee[] acted in a reckless [] manner *but whether reasonable minds could find that they acted in such a manner when the facts presented are viewed in a light most favorable to [the plaintiff].*' " (Emphasis added.) *Widdowson v. Lake Cty.*, 2026-Ohio-67, ¶ 12 (11th Dist.), quoting *Smathers v. Glass*, 2022-Ohio-4595, ¶ 34.

## IV. Discussion

{¶ 23} The central question in this case is whether genuine issues of material fact remain as to Officer Anderson's entitlement to immunity as a matter of law. We find that they do.

### A. Threshold issue: Does a Fourth Amendment analysis apply?

{¶ 24} As an initial matter, we note that, in addition to challenging the trial court's determination that a genuine issue of material fact exists as to whether he acted recklessly in shooting Lewis, Officer Anderson contends that the trial court failed to apply the Fourth Amendment's objective-reasonableness standard in evaluating his use of deadly force. According to Officer Anderson, "[t]he first question that must be answered when determining immunity is: Were Anderson's actions objectively reasonable in his use of force? If yes, summary judgment must be granted, and no other analysis is required." (Brief of Appellant at 28-29.) He argues that "[t]he trial court did not take this first step, which was an error," and further maintains that the undisputed evidence establishes that his use of force was objectively reasonable, thereby entitling him to immunity. *Id.* at 29. Although we do not agree with Officer Anderson that the Fourth Amendment's objective-reasonableness inquiry constitutes a mandatory "first step" in a state law statutory-immunity analysis involving an officer's use of force during an arrest, we do recognize that consideration of whether an officer's conduct was objectively reasonable is often a useful

threshold inquiry in assessing whether the officer's conduct rises to a higher degree of culpability, such as recklessness. Nevertheless, we reject Officer Anderson's contention that the undisputed facts in this case demonstrate that his use of force was objectively reasonable. To the contrary, we conclude that a genuine issue of material fact exists on that question, which the finder of fact must decide.

{¶ 25} By way of background, the Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const., amend. IV. The prohibition against unreasonable searches and seizures encompasses an individual's right to be free from the use of excessive force during an arrest. *See Bordelon v. Franklin Twp.*, 2001 Ohio App. LEXIS 5570, *16 (10th Dist. Dec. 13, 2001), citing *Graham v. Connor*, 490 U.S. 386, 394 (1989). Under 42 U.S.C. 1983, an individual may bring a civil action in state or federal court against law-enforcement officers for constitutional violations, including the use of excessive force in violation of the Fourth Amendment. *See Graham* at 394-395. In such cases, the relevant inquiry is whether the officer's use of force was objectively reasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. This standard requires courts and juries to evaluate the officer's conduct "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and to give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Importantly, "the use of deadly force is only constitutionally permissible if 'the officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others.' " *Livermore v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007), quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). If the officer's use of force is objectively reasonable, no Fourth Amendment violation has occurred and the plaintiff's 42 U.S.C. 1983 claim necessarily fails.

{¶ 26} Here, Officer Anderson cites no Ohio cases holding that application of the Fourth Amendment's objective-reasonableness standard is a prerequisite to the statutory-immunity analysis under R.C. 2744.03(A)(6)(b), which asks whether a political-subdivision employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

Nor have we found any ourselves. This makes sense. Because R.C. 2744.03(A)(6)(b) applies broadly to all political-subdivision employees, not solely to law-enforcement officers, *see Argabrite v. Neer*, 2016-Ohio-8374, ¶ 7, it would be odd to treat the Fourth Amendment's objective-reasonableness standard—which applies primarily in the law-enforcement context—as an inherent component of the statutory-immunity analysis.

{¶ 27} This is not to say, however, that the objective-reasonableness inquiry lacks all utility in the immunity context, rather we decline to characterize it as a mandatory "first step" in the statutory-immunity analysis, as Officer Anderson urges us to do.

{¶ 28} In police use-of-force cases involving statutory immunity, the Fourth Amendment objective-reasonableness standard may serve as a helpful analytical tool because it helps distinguish objectively reasonable conduct from conduct reflecting a higher degree of culpability. *See Hayes v. Columbus*, 2014-Ohio-2076, ¶ 28 (10th Dist.) (observing that Fourth Amendment jurisprudence "is helpful in analyzing statutory immunity claims"); *see also Jordan v. Howard*, 2021-Ohio-4025, ¶ 72-75 (2d Dist.); *King v. Columbus*, 2024 U.S. App. LEXIS 20146, *14-17 (6th Cir. Aug. 9, 2024). This is because, if an officer's use of force is objectively reasonable under the circumstances, then it cannot satisfy the heightened culpability necessary to establish recklessness or wantonness, much less bad faith or malicious conduct. *See Mullins v. Cyranek*, 805 F.3d 760, 769 (6th Cir. 2015), quoting R.C. 2744.03 (A)(6)(b) (where a police officer's use of force is objectively reasonable, "it follows that he did not act with 'malicious purpose, in bad faith, or in a wanton or reckless manner,' as required to avoid statutory immunity under Ohio law"). Indeed, "recklessness" has been defined, in part, as conduct that is "unreasonable under the circumstances and is substantially greater than negligent conduct." *See Anderson*, 2012-Ohio-5711, at ¶ 34. Accordingly, conduct that is reasonable under the circumstances would necessarily fall short of this standard. Thus, where statutory immunity turns on the propriety of a police officer's use of force, a Fourth Amendment analysis may provide a useful starting point for determining whether a viable exception to immunity exists or whether the immunity inquiry effectively ends because the officer's conduct was reasonable as a matter of law.

{¶ 29} Relatedly, where genuine issues of material fact remain regarding whether an officer's use of force was objectively reasonable under the circumstances, those same factual

disputes may bear directly on whether the officer acted with a heightened degree of culpability, such as recklessness or wantonness. *See King*, 2024 U.S. App. LEXIS at *5 (noting that "the [trial] court denied summary judgment on the Fourth Amendment claim because it found that disputes of fact existed as to whether [the officer] or others in the area 'were threatened with serious bodily injury' when [the officer] shot [the decedent]"); *see also Martin v. Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) (recognizing that where "resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims").

{¶ 30} Here, although the trial court did not expressly analyze whether Officer Anderson's actions were objectively reasonable under the circumstances, as noted above, it was not required to do so. In any event, for the reasons discussed below—mainly that genuine issues of material fact remain as to whether it was objectively reasonable for Officer Anderson to shoot Lewis, and those same genuine issues of material fact bear on whether Officer Anderson's conduct exceeded mere negligence and rose to the level of recklessness— denial of summary judgment was appropriate.

**B. Genuine Issues of Material Fact Exist as to Whether Immunity Applies**

{¶ 31} Recklessness is defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *See Anderson* at ¶ 34. As a practical matter, the danger inherent in pointing and discharging a gun at another person is so plainly foreseeable that it necessarily constitutes a "known or obvious" risk of serious harm. Accordingly, in cases where a police officer has shot a suspect, the central inquiry in determining whether the officer acted with a "conscious disregard of or indifference to" the harm inherent in shooting someone, is whether the officer reasonably and genuinely perceived the suspect as posing a threat of serious harm to the officer or others. If so, the officer's use of deadly force can be seen as a deliberate and measured response to neutralize the threat, rather than as conduct reflecting a conscious disregard of, or indifference to, the obvious risk of harm inherent in shooting another person.

{¶ 32} Although Officer Anderson asserts that such a threat existed here—i.e., that he reasonably and genuinely believed that Lewis posed a threat of serious harm to him and

his fellow officers—and supports this assertion with an expert affidavit from retired Columbus Police Officer James J. Scanlon, the relevant question at the summary judgment phase is not what Officer Anderson or his expert believe to be true; rather, the question is whether the evidentiary record, viewed in the light most favorable to the Estate, establishes the absence of a genuine issue of material fact on this point. If a jury could conclude from the evidence that Officer Anderson did not face such a threat, or that his perceptions of a threat were caused by his own actions or inactions and not by the reality of the situation he faced, and that these actions or inactions exceeded mere negligence, then summary judgment must be denied, and the issue must be allowed to go to the jury at trial.

{¶ 33} In conducting our own independent review of the record, we remain mindful that police officers, unlike other employees of political subdivisions, are tasked with effecutating arrests and are therefore routinely placed in situations that carry the potential for dangerous and violent encounters. *See Agrabite v. Neer*, 2016-Ohio-8374, ¶ 31. For that reason, "the burden necessary to deny immunity to those officers is onerous." *Id.* Nevertheless, we are confident that the Estate has satisfied that burden—at least at the extent necessary to overcome summary judgment. Accordingly, we agree with the trial court that genuine issues of material fact remain as to whether Officer Anderson reasonably and genuinely perceived an imminent threat of death or serious bodily harm to himself or others, such that his decision to shoot Lewis is protected by statutory immunity.

{¶ 34} To begin, the Estate submitted sworn affidavits and reports from three different experts that may support a jury's finding that Officer Anderson's actions were not only unreasonable, but also rose to the level of recklessness.

{¶ 35} First, the Estate submitted the affidavit of Michael D. Lyman, Ph.D., an expert in the field of police practices. Dr. Lyman opined that "[t]he use of deadly force by Columbus Police Officer Ricky Anderson against Donovan Lewis was reckless, improper, excessive and served no legitimate law enforcement purpose." (May 29, 2024 Pls.'s Opp. to Def. Anderson's Mot. for Summ. Jgmt., Aff. of Dr. Lyman at 1-2.) Dr. Lyman further explained that Lewis's actions and mannerisms "failed to justify a lethal force response" because "[Officers] Knox and Anderson had complete control over Lewis at all times while 'covering' him with their firearms," and "the video clearly shows Lewis' arms raising upward in a fashion consistent with surrendering at the time [Officer] Anderson shot him."

*Id.* at 2. In his preliminary expert report, which was also submitted by the Estate in response to Officer Anderson's motion for summary judgment, Dr. Lyman expounded on these conclusions, stating that at the point that Sergeant Knox and Officer Anderson opened Lewis' bedroom door, they had no reason to use deadly force because the door frame provided adequate cover by which to shield themselves. Specifically, Dr. Lyman explained:

> [B]ased on numerous reviews of [Sergeant] Knox's body worn camera video, and other officer BWC video, at the time Officer Anderson discharged his weapon neither he, [Sergeant] Knox nor anyone else was facing a threat of death or serious physical injury. This is because both [Officer] Anderson and [Sergeant] Knox had the availability of cover if needed. Unless a suspect is posing a threat of death or serious physical injury, then lethal force is improper and unnecessary. Such was the case in this incident.

> Even more disturbing is the image from Sergeant Knox's body worn camera showing Lewis with his hands up in a position consistent with him surrendering to officers . . . As Lewis assumes this position, [Officer] Anderson, failing to properly assess what he is viewing, discharges his weapon one time, striking Lewis.

(Prelim. Expert Report of Dr. Lyman at 16.)

{¶ 36} Second, the Estate submitted the affidavit and report of Stephen M. Casner, Ph.D., a former NASA human factors research psychologist. Dr. Casner attested that, based on his expertise, "Officer Anderson's decision time to shoot was significantly shorter than the choice reaction times for anyone, particularly someone of [Officer Anderson's] age, regardless of experience or training[,]" and that "[i]t is likely that parts of the decision-to-fire process, characteristic of experienced officers, were skipped or elided." (Report of Dr. Casner at 2.) Specifically, as part of his report, Dr. Casner explained:

> After the door was opened and the bedroom interior illuminated by the weapon light on [Sergeant] Knox's gun, Officer Anderson initiated his trigger pull in less than 400 milliseconds. For a young participant in a choice reaction time experiment conducted in a laboratory setting in which their safety is assured, this is a significantly faster than an average performance. For a 60-year-old participant in a safe laboratory experiment, a response in this timeframe is exceedingly rare. In a study of the effect of aging on choice reaction time, a study by Woods, Wyma, Lund, Herron, &

Reed (2015) found that only a single participant among the 1,466 officers they tested responded this quickly, and only on a single trial. In a study of police officers, Vickers & Lewinski (2012) found that elite officers averaged more than 500 milliseconds in aiming their gun and deciding to fire after their gun had already been drawn, raised, and extended in the direction of the suspect.

. . .

One interpretation of these facts is that Officer Anderson attempted to speed up the perceive and react process beyond its practical limits. . . . Another interpretation is that the decision to fire was made or biased in favor of being made before the light came on and the situation was fully perceived.

*Id*. at 2, 3.

{¶ 37} Dr. Casner also explained how Officer Anderson's actions did not demonstrate a genuine fear for his own safety or that of the other officers. Dr. Casner opined:

The officers should have announced that they were going to open the door and that the suspect needed to have his hands above his head and in plain view before the door was opened. This would help turn the unpredictable into the predictable for both the officers and the suspect.

. . .

Officer Anderson opened the door approximately 0.66 seconds before [Sergeant] Knox arrived to his ultimate position as cover officer. Hence, the bedroom interior remained in darkness. For an additional 0.8 seconds after [Sergeant] Knox arrived to his final position, his weapon light remained off. From a perspective of the officer's safety, if they were concerned about activities inside the room, this makes little sense.

*Id*. at 4.

{¶ 38} The Estate also submitted the report of Kyle Heyen, an expert in civilian and law enforcement canine training. After reviewing the BWC footage, deposition testimony, and Columbus Police Department K-9 policies, Heyen concluded that Boef's behavior after locating Lewis in the bedroom off the kitchen should have signaled to Officer Anderson that Lewis did not pose an immediate threat of serious harm. As Heyen explained, properly trained police dogs are conditioned not to disengage from a suspect "if the person is

perceived as a threat," and in this case, Boef returned to Officer Anderson several times rather than remaining trained on Lewis. (Prelim. Report of Heyen at 19.)

{¶ 39} During his deposition, Officer Anderson acknowledged that Boef's actions were indicative of Lewis being a non-threat. Specifically, when he was asked by the Estate's counsel whether "if the dog sees the suspect in the room and then comes back out, it's because the dog doesn't see that person as a threat," Officer Anderson responded, "Yes, sir." (Nov. 29, 2023 Dep. of Officer Anderson at 58.)

{¶ 40} Heyen further opined that "[Officer] Anderson failed to follow the Columbus Department of Police K9 Unit policy because [Officer] Anderson did not issue the required number of warnings prior to deploying K9 Boef into the apartment." (Prelim. Report of Heyen at 9.) Section 5.02 of the policy provides:

> The canine officer will alert the person(s) inside the building verbally. The warning given will state that a police canine will be released in the building if the person(s) fails to make themselves known. The warning will be issued no less than two (2) separate times before entry is made. Reasonable time will be given for a response to the warnings.

(Canine Unit, Standard Operating Procedures Manual, § 5.02 at 6.) According to Heyen, Officer Anderson gave only a single announcement from the apartment front door immediately before deploying Boef to search for Lewis. Heyen noted that neither Officer Anderson nor any other officer repeated the warning or issued any additional commands before Officer Anderson opened the bedroom door and shot Lewis.

{¶ 41} Heyen also criticized the pace and manner of Officer Anderson's response, opining that Officer Anderson failed to fully assess the situation or employ "even the most basic of officer safety skills." (Report of Heyen at 11.) In Heyen's view, the underlying arrest warrants for a misdemeanor domestic violence charge and a three-month-old improper handling of a firearm charge did not require immediate confrontation without first attempting de-escalation procedures. He explained that Officer Anderson and the other officers could have secured the perimeter to protect nearby civilians and initiated communication with Lewis before forcing a direct encounter by abruptly opening the bedroom door. In Heyen's expert opinion, these measures would more likely than not have resulted in Lewis' arrest without the use of deadly force.

{¶ 42} Additionally, Heyen observed that at the time of the shooting, Boef was not leashed. Instead, Officer Anderson held the dog by its metal collar with his left hand while simultaneously holding his firearm in his right. Heyen stated that police dog handlers are trained not to do this because any sudden movement by the K-9 could cause the officer to accidentally discharge their weapon.

{¶ 43} Consistent with Dr. Lyman's expert report, Heyen noted that during the roughly 90 seconds between Officer Anderson's arrival and the shooting, Officer Anderson repeatedly failed to use available cover or concealment. According to Heyen, such conduct suggested that Officer Anderson himself did not perceive Lewis as presenting an immediate threat of serious harm. In summation, Heyen concluded that "what is obvious from Defendant Anderson's actions during the building search is that he is not worried for his safety, as he fails to use the most basic officer safety skills taught to every law enforcement officer." (Report of Heyen at 11.)

{¶ 44} In addition to the expert testimony provided above, a series of adverse inferences may be drawn against Officer Anderson as a result of Officer Anderson's decision to exercise his Fifth Amendment privilege against self-incrimination in response to questions asked of him by the Estate's counsel during his deposition. *See State ex rel. Verhovec v. Mascio*, 1998-Ohio-431, ¶ 13.

{¶ 45} The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Although the language of the amendment itself speaks to the inability to compel testimony in a criminal case, the right has been extended to civil proceedings, including civil pre-trial discovery, albeit with lesser protections. *See Vega v. Tivurcio*, 2014-Ohio-4588, ¶ 11 (10th Dist.). While comments regarding a criminal defendant's invocation of the right against self-incrimination are prohibited altogether, *see Griffin v. California*, 380 U.S. 609, 614 (1965), there is no constitutional protection against drawing an inference against a party invoking the Fifth Amendment privilege in a civil case. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. . . .").

{¶ 46} At Officer Anderson's deposition, he was asked several questions by the Estate's counsel where adverse inferences may be drawn. Regarding whether Officer Anderson reasonably and genuinely perceived an imminent threat of death or serious bodily harm to himself or others when he shot Lewis, Officer Anderson was asked:

> Did you believe at any time prior to discharging your firearm that Donovan Lewis was about to use deadly force against you or any of your fellow police officers in the early-morning hours of August 30th, 2022?

(Officer Anderson Dep. at 146.) Officer Anderson invoked his Fifth Amendment right in response to this question, thus permitting an inference that he did not perceive an imminent threat of death or serious bodily injury before shooting Lewis; that his use of force was unreasonable under the circumstances; and that his decision to employ deadly force had been made prior to actually assessing the need for deadly force, thus rendering his actions reckless. Other similar questions abound, leading to the same or similar inferences which create a genuine issue of material fact for trial. For example, Officer Anderson invoked his Fifth Amendment right after being asked the following questions:

> Q. Isn't it true, sir, that Donovan Lewis did not raise his arm at you in a manner that threatened deadly force prior to you discharging your gun in his direction?
>
> . . .
>
> Q. Isn't it true, sir, that when you fired your gun into the room of Donovan Lewis, that there were no lights on in Mr. Lewis's bedroom at the time?
>
> . . .
>
> Q. Isn't it true at this point in the video, Mr. Anderson, when you opened that door, prior to the time you discharged your weapon, you did not have the time to perceive any threat of deadly force?
>
> . . .
>
> Q. Isn't it true, Mr. Anderson, that you never saw an object in Donovan Lewis's hand prior to firing your weapon into his bedroom -- . . . on the night of August 30th, 2022?
>
> . . .
>
> Q. Isn't it true, Mr. Anderson, that no weapon was found inside Donovan Lewis's apartment on the night of August 30th, 2022?

. . .

Q. Isn't it true, Mr. Anderson, that by shooting your gun into the bedroom where Donovan Lewis was, striking him and killing him, that you violated CPD policies and directives on the use of deadly force?

. . .

Q. Isn't it true, Mr. Anderson, that at the time you fired your gun into Donovan Lewis's bedroom, you had no reason to believe that he was a threat to use deadly force?

. . .

Q. Isn't it true, sir, that you fired your weapon into Donovan Lewis's bedroom in the early-morning hours of August 30th, 2022, before you could perceive and react to any threat of deadly force?

. . .

Q. Isn't it true, sir, that you only fired your gun one time because you did not observe Donovan Lewis exhibit any threat of deadly force?

*Id*. at 148-165.

{¶ 47} Finally, the BWC video footage of the shooting is itself highly relevant at the summary judgment phase. Here, Officer Anderson argues that this footage conclusively demonstrates that his decision to shoot Lewis was reasonable because Lewis had apparently shut the door to his bedroom, indicating he was evading arrest, and once the door was opened, he raised his hand while holding an unknown object. While we do not dispute that this is one way to view the video footage, it is certainly not the only way to view it. When viewed in the light most favorable to the Estate—as we must on summary judgment—what the video appears to show is Officer Anderson firing his gun almost simultaneously with him opening the bedroom door and Sergeant Knox's light activating. The speed of the encounter, the darkness inside the room, and the limited time available for Officer Anderson to reasonably and genuinely perceive a threat, are all matters a jury should be permitted to evaluate in real time by watching the video evidence and listening to the direct and cross-examinations of the officers and experts involved, in order to determine whether Officer Anderson reasonably and genuinely perceived a threat of serious bodily harm.

{¶ 48} The Supreme Court of Ohio has instructed that, at the summary judgment stage of proceedings, courts "must look at the evidence and determine whether it is so one-sided that the party claiming immunity should prevail as a matter of law." *Smathers*, 2022-Ohio-4595, at ¶ 85. Based on the evidence in the record before us, we find that reasonable minds could disagree as to whether Officer Anderson reasonably and genuinely perceived a risk of serious harm prior to shooting and killing Lewis, and thus whether Officer Anderson's actions were reckless under the circumstances. *See Ruth v. Jennings*, 136 Ohio App.3d 370, 375 (12th Dist. 1999), quoting *Brockman v. Bell*, 78 Ohio App.3d 508, 517 (1st Dist. 1992) ("Because the line between willful or reckless misconduct, wanton misconduct, and ordinary negligence can be a fine one, 'the issue . . . should be submitted to the jury for consideration in light of the surrounding circumstances when reasonable minds might differ as to the import of the evidence.'"). Accordingly, we overrule Officer Anderson's sole assignment of error.

## V. Disposition

{¶ 49} For the foregoing reasons, we overrule Officer Anderson's sole assignment of error and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, P.J., and JAMISON, J., concur.

———————————